# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### April 10, 2012 Session

## STATE OF TENNESSEE v. ASHUNTI ELMORE

**Appeal from the Criminal Court for Shelby County**
**No. 0904525    W. Mark Ward, Judge**

---

**No. W2011-01109-CCA-R3-CD  - Filed December 13, 2012**

---

The defendant was convicted of two counts of reckless aggravated assault, Class D felonies, and sentenced to serve two concurrent three-year terms, split six months in confinement with the balance to be served on probation.  On appeal, she contends that the evidence was insufficient to support her convictions, that double jeopardy prevented her dual convictions, and that the trial court erred in denying her judicial diversion. After careful review, we conclude that sufficient evidence exists to support her convictions, that double jeopardy requires her two convictions be merged and that the trial court did not abuse his discretion in denying judicial diversion.  The defendant's convictions and sentence of three years with six months served in confinement and the balance on probation are affirmed   This case is remanded to the trial court solely for purposes of entering a single corrected judgment.

### Tenn. R. App. P. 3 Appeal as of Right; Affirmed and Remanded

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which CAMILLE R. MCMULLEN AND JEFFERY S. BIVINS, JJ., joined.

Arthur Horne (at trial) and Joseph A. McClusky (on appeal), Memphis, Tennessee, for the appellant, Ashunti Elmore.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Robert Ratton, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS AND PROCEDURAL HISTORY

On March 2, 2009, the defendant, Ashunti Elmore, stabbed the victim, her former partner Nikki Chaffen, with a kitchen knife during a domestic dispute. On July 21, 2009, the defendant was indicted on two counts of intentional aggravated assault in violation of Tennessee Code Annotated section 39-13-102. At the defendant's trial on November 8-10, 2010, the following evidence was presented:

The victim identified the defendant in open court and testified that she had entered into a relationship with her sometime during 2007. The victim testified that she lived with the defendant for a period of time in a house on Gaywinds Avenue in East Memphis, but she moved out of this house sometime after Christmas of 2008 and stayed with her family. The victim testified that she moved most of her essential items out of the house on Gaywinds Avenue at that time, but she left behind many incidental items, including several items belonging to her young son. The victim testified that she retained the key to the house on Gaywinds Avenue after she moved out and that her name remained on the lease. She testified that she and the defendant exchanged periodic text messages concerning her plans to remove the remainder of her items from her old house once her new house was ready. She testified that her relationship with the defendant was "casual" during this time period.

The victim testified that in the days before the incident she informed the defendant that she intended to come by the house on Gaywinds Avenue to remove the remainder of her items on March 2, 2009. The victim testified that on the evening of March 1, 2009, she and a female friend (who was visiting from California) went to a bar in downtown Memphis. While they were there, they met up with some other friends, including an individual named Chad Johnson.

The group had been at the bar for a while when suddenly the defendant—who had apparently entered the bar without the victim noticing—"got in [the victim's] face and was threatening and hostile. . . ." The victim testified that the defendant asked her "how dare [she] bring this person [from California] to Memphis," told her that she "couldn't do any better," and threatened that "everything that [she] had at the house was going to get burned up." The victim testified that this hostile confrontation continued for about five minutes. She testified that she refused to escalate the situation, and the situation had largely "played itself out" by the time Chad Johnson came over and stood over her right shoulder. The victim testified that after the defendant went away she "put it behind me" and ended up "hav[ing] a really good time" for the rest of the night.

The victim testified that on March 2, 2009, she had been planning on picking up a U-Haul to retrieve her items from the house on Gaywinds Avenue after she dropped her son

off at school. She testified that as she drove past the house—which she testified was on the way to her son's school—she saw "a lot of [her] things hanging out of the dumpster." Because she knew that it was trash day, she decided to return straight back to the house to get them after dropping off her son. At this point, the victim was shown and authenticated several pictures of the outside of the residence. She identified from the photographs some of her personal items spilling out of an overflowing trash dumpster by the curb in front of the residence and some cardboard boxes containing more of her personal items next to it. These photographs were entered into evidence.

The victim testified that when she returned to the residence, she fished a few things out of the garbage. After a short time, however, she decided that she "probably would do better" if she retrieved her son's items from inside of the house first. The victim testified that these items included a V-Smile, learning games, school awards, a comforter, and some pillows.

The victim testified that she unlocked the door to the residence using her key at around 8:30 a.m. She testified that she initially assumed that no one was awake because she saw no one in the house. She testified that she had entered the front room of the house where some of her items should have been located when the defendant "came down the hallway barreling," telling her to "get the fuck out" repeatedly. The victim responded that she was only going to leave after she had retrieved things because the defendant had put so many of her possessions in the garbage. The defendant continued making statements like "I hate you" and "I'm going to kill you."

The victim testified that she had turned her back to the defendant when she suddenly felt the defendant "swinging" at her. She testified that the defendant "made contact" with her. When she turned back around, she saw that the defendant had a knife. She grabbed the defendant by the wrists, pulled her arms over her head, and told her to drop the knife. The defendant complied, and the victim kicked the knife away before noticing that there was blood on the wall. Then "something clicked," and the victim doubled over before stumbling back toward the window seat located in the kitchen.

From the window seat, the victim began calling for help. The victim testified that she could not take a full breath by this time and was "freaking out because there was so much blood coming [out]." The victim testified that the defendant refused to call for aid and told her "no, you're fine, you just need me to stop the bleeding." The victim testified that the defendant retrieved a towel and pressed it into her chest, but this only served to exacerbate her pain. The victim testified that she asked the defendant to call 911 nine or ten different times.

-3-

Eventually, the defendant did call 911. The victim testified that she heard the defendant explain to the 911 operator that her "roommate [had] tripped over the dog and cut herself." The victim testified that she could not breathe during this time period, and she apparently lost consciousness. When she opened her eyes again, paramedics were present. At this point, the victim was shown additional photos of the crime scene depicting the interior of the house, blood splatter, and some of her personal items. She authenticated these photographs and they were entered into evidence.

The victim testified that the paramedics cut off her clothes in an attempt to discover the source of her bleeding, and they found cuts to her right lung and her left thigh. The paramedics were forced to administer oxygen to her because she was not able to breathe. The victim testified that while the defendant was leaning over one of the paramedic's shoulders, she told them that the defendant had stabbed her. She testified that her memory concerning what happened afterward was not clear, but she knew that one of the paramedics called for someone else. The victim testified that she did have a very clear memory of being taken out of the house, "because it was freezing cold and they had cut [her] clothes off."

The victim testified that she was taken to a trauma center where she underwent surgery to repair a laceration to her liver and a collapsed lung. Her thigh was also stapled. The victim testified that she was given a chest tube, which was in place for about a week, and forced to undergo breathing treatments. She testified that she was placed on a morphine drip for her pain and was administered a considerable amount of antibiotics. The victim testified that at the present time she was still in "constant" pain, for which she was taking pain medication, and she was still being administered breathing treatments as a result of the attack. The victim concluded by testifying that she never struck the defendant on March 2, 2009.

On cross-examination, the victim testified that she did not believe that she had called the defendant following their confrontation on March 1, 2009, to tell her that she was still coming over to the house on the following day. The victim denied that she drove by the house on the morning of March 2, 2009, just because she wanted to "do[] a drive-by." The victim acknowledged that she did not call or text the defendant or ring the doorbell before entering the house that morning. The victim was also questioned in detail concerning several facts to which she had attested in her direct testimony which defense counsel claimed were not included in her testimony at a preliminary hearing.

The victim acknowledged on the stand that she was a "fighter" who had a short fuse. The victim did not deny having said previously that she was "crazy" and that she would fight anybody "at any time for anything." She also did not deny that she stated "this is how we're going to do it" on the morning in question after the defendant told her that her things were

-4-

located in the carport. Defense counsel then repeatedly accused the victim of starting "the fight," or of "tussling" with the defendant, on the morning in question. Each time, the victim denied that any "fighting" had occurred. In response to defense counsel's accusation that she had shown up unannounced at the defendant's house, the victim simply responded that it was her house. Finally, the victim denied defense counsel's claim that the defendant had cared for her until help arrived after 911 was called, stating that the defendant simply "pressed a towel into a stab wound that she inflicted."

On re-direct examination, the victim testified that the house where the incident had occurred was small and had hardwood floors. As a result, if anyone had been fighting in one of the rooms, the noise would have been audible in the bedrooms, and a "big brawl" would have woken up the defendant's new roommate. The victim also testified that she would have testified at the preliminary hearing concerning the fact that the defendant had told the 911 operator that she (the victim) had cut herself by tripping over a dog if she had been asked that question at that time.

Mr. Chatayras Chad Johnson, the defendant's work supervisor, testified that he knew the victim from working with her at various Macy's locations. He testified that on the night of March 1, 2009, he met the victim and an out-of-town female friend at a location called "Euphoria." After visiting with the victim briefly, he and the victim's female friend stepped away to get drinks, leaving the victim sitting alone at the counter. While they were walking away, the witness glanced in a mirror and saw someone approach the victim. It appeared that the two started arguing. The witness testified that he turned around and went back toward the activity. He identified the defendant in open court as the individual who was arguing with the victim.

Mr. Johnson testified that the defendant held her face up to the victim's ear during the argument. He testified that he went and stood behind the victim because he believed that there was going to be a confrontation and possibly a fight. He testified that he could not see the victim's face during the argument because he was standing behind her.

Mr. Johnson testified that he heard the defendant say something about some clothing, and then as he moved closer, he heard the defendant say "if I can't fucking have you, no one can." The witness testified that the victim responded by telling the defendant to leave her alone and saying "don't start this." After some additional conversation, which he could not hear, the victim "threw her arms up and said you know what, if you want to fight me, let's do it now." The witness testified that in response he grabbed the victim's purse.

Mr. Johnson testified that no fight ever broke out and that after the argument was over both the defendant and the victim calmed down. He testified that they had a good time for

the remainder of the evening. He testified that at no point during the evening did the victim ever throw a punch or adopt an aggressive stance towards the defendant.

On cross-examination, Mr. Johnson acknowledged that he had no knowledge of any of the events that had occurred the next morning at the house on Gaywinds Avenue. He denied that the club where they were located the evening before was dark, but he acknowledged that there was loud music playing. He testified that the victim was "ready to fight" the defendant that night. He also testified that he was aware of the past relationship between the victim and the defendant. On redirect examination, Mr. Johnson testified that he had been forewarned as a store manager that there had been a hostile relationship between the defendant and the victim and that he had been instructed to call security if the defendant ever came into the store.

Ms. Carla Albonetti, a paramedic with the Memphis Fire Department, testified that she responded to an emergency call coded as an accidental cutting—not a stabbing—at a residence on Gaywinds Avenue on March 2, 2009. Ms. Albonetti testified that when she knocked on the door of the residence, the defendant (whom she identified in open court) answered the door and told her that the victim "had tripped over a dog and cut her leg." The witness testified that there was a "little yappy dog" present at the residence, which she asked the defendant to put away.

Ms. Albonetti testified that when she went into the kitchen to check on the victim, she "noticed immediately that there was a steak knife over on the counter by the sink, and there was blood on the floor and the defendant was wiping the blood up with I think a T-shirt or something. . . ." She testified that the scene immediately struck her as strange because "usually if there's some kind of a fight scene, it's kind of chaotic, but it was not that at all." Ms. Albonetti testified that the defendant initially told her that the victim had cut her leg, so she cut the victim's pants off of her leg and discovered a wound there. However, she also saw a large amount of blood on the victim's side, and "very quickly assessed her and realized that something [wa]s just not right, this [wa]s more than a cut on the leg." The witness testified that the victim was "way too calm" and had a weak pulse, which she believed could not have been caused by the cut on her leg.

Ms. Albonetti testified that she pulled up the victim's shirt and discovered that the victim had a wound to her chest as well. She immediately recognized that this wound was a stab wound due to her years of experience treating such injuries. She testified that the knife appeared to have entered the "lower part of the lung, and the diaphragm area and the liver." She removed the victim's shirt, listened to her chest, and determined that the victim was having severe difficulty breathing and "was not moving a whole lot of air."

-6-

Ms. Albonetti testified that the victim was barely able to talk and communicated primarily by shaking or nodding her head. When she asked the victim whether she had simply fallen on a knife, the victim shook her head "no." When she informed the victim that she had been stabbed, and asked who had stabbed her, the victim was able to whisper, "Ashanti." The witness testified that after hearing this she stood up, turned around, and asked the defendant, who was still wiping up blood and cleaning things up, "who's Ashanti?" The defendant acknowledged that it was her.

Ms. Albonetti testified that after hearing this she walked into the living room and asked her Lieutenant, Mr. Sankeno Christian, to follow her. She informed him that the victim had been stabbed, that they were standing in a crime scene, that the victim had identified the defendant as the individual who had stabbed her, and that they needed to call the police. She testified that they turned their radios down, went into another area, and called dispatch.

Afterward, Ms. Albonetti testified that she returned and continued treating the victim. She testified that the victim had low blood pressure and was in "dire straits at that point." She clarified that the victim was in critical condition and would have died absent medical intervention. She testified that she inserted an IV into the victim and administered oxygen to her. The victim was transported out of the house by stretcher and rushed to the hospital by an ambulance with its lights and sirens activated.

Ms. Albonetti was shown several pictures of the victim's injuries and the crime scene on the day in question, which she authenticated and which were entered into evidence. She testified that in her opinion as a paramedic, there was no chance of stanching the internal blood flow and saving the victim's life by pressing a dishcloth against the victim's wound. Finally, the witness added that during the entire time she was in the residence she did not notice any cuts or bruises on the defendant and that the defendant did not appear to be hurt in any way.

On cross-examination, Ms. Albonetti testified that the defendant greeted her at the door and was generally cooperative on the day in question. She acknowledged that someone lacking specialized training might believe that they could stop bleeding by applying pressure to a wound. She testified that she could not speak concerning anything that happened prior to her arrival at the residence, and she did not know whether or not a fight had occurred.

Mr. Sankeno Christian, a paramedic supervisor, testified that he responded to a call on March 2, 2009, with Ms. Carla Albonetti. He testified concerning the events that followed in a manner consistent with the testimony of Ms. Albonetti. He testified that the defendant did not have any scratches, cuts, bruises, torn clothing or anything else about her

that indicated that she had been in a fight that day, and he agreed that the defendant told paramedics that the victim had "fallen on something." He testified that after Ms. Albonetti told him that the victim had told her that the defendant had stabbed her, he called for police assistance. He testified that afterward, he attempted to secure portions of the crime scene. He also was shown and authenticated several photographs of the inside of the residence, a bloody towel, and a bloody knife, which were then entered into evidence.

Officer Brian Bermudez of the Memphis Police Department testified that he responded to a call at a residence on Gaywinds Avenue on March 2, 2009, to discover the victim being treated by Ms. Albonetti. He testified that he walked up and asked the victim who did it, and the victim pointed at the defendant. He testified that the defendant was "just calm as she could be" and "not really saying anything." He testified that he got a good look at the defendant that day, and he did not notice any scratches, bruises, or anything else about her appearance that made him believe that she had been in an altercation.

Officer Bermudez testified that he walked through the house and discovered "a lot of blood in the kitchen." He testified that he also discovered a knife and some bloody rags. It appeared as though someone had been trying to clean up the blood. He testified that while he was there, an individual came out of the back bedroom. He testified that this individual appeared to have just woken up because he "was rubbing his eyes" and "had no clue" what had happened. He testified that he took the defendant into custody and transported her to the police station.

On cross-examination, Officer Bermudez testified that the defendant was calm and cooperative when he arrived at the residence. He testified that he did not ask the defendant to pull up her shirt or pull down her pants so that he could examine her body for scratches or bruises. Officer Bermudez acknowledged that he had no direct knowledge concerning the incident that had occurred because he was not present at the time.

Mr. Peatron Cummings, an EMT with the Memphis Fire Department, testified that he also responded to a call at a residence on Gaywinds Avenue on the date in question. He testified that police and other paramedics, including Ms. Carla Albonetti, were already present on the scene. He testified that the victim was already "packaged" and ready for transport when he arrived. He testified that he carried the victim to his ambulance by stretcher and transported her to the hospital with his lights and sirens activated. He testified that the victim was in critical condition at the time and was "bleeding out."

The State's final witness, Officer Ricky Davidson of the Memphis Police Department, testified that he had been employed as a crime scene investigator and had investigated a crime scene at a house on Gaywinds Avenue on March 2, 2009. He testified that the victim

had already been transported to the hospital when he arrived at the residence. He testified that he photographed and sketched the crime scene. He also discovered a bloody towel, a bloody shirt, and a steak knife covered in an unknown substance, which he collected. He authenticated these photographs and items, and they were entered into evidence. Officer Davidson testified that he found no signs of a fight or disturbance at the residence during his investigation.

Following this testimony, the State rested. The defense presented the testimony of four witnesses. Mr. Ralph Minors, Jr., who worked with the defendant at the Transportation Security Administration, testified that he also performed lock-smithing services on the side. He testified that at 6:00 a.m. on March 2, 2009, his phone received a text message from the defendant requesting that he rekey the locks of her home. He testified that he was asleep, but called the defendant after he woke. The defendant answered the phone but was still in bed. He testified that he told the defendant to call him when she woke up and he would come over and change the locks.

Mr. Todd Luttrell testified that he knew the defendant from working with her at UPS eight years earlier. He testified that on March 2, 2009, he was the defendant's roommate. He testified that he had moved in approximately two weeks earlier and that no one else lived in the residence. He testified that before he moved in, he and the defendant moved all of the victim's items outside to the carport. He testified that none of the victim's items were located in the residence after he moved in. He testified that on the morning of March 2, 2009, he woke up to discover policemen in the house. He testified that he had heard nothing prior to his being woken by a "lady cop."

On cross-examination, Mr. Luttrell testified that he had no knowledge of what items had belonged to the victim other than what he had been told by the defendant. He acknowledged that the defendant did not have any children, and consequently a child's car seat discovered in the residence probably did not belong to her. He testified that he was not under the influence of drugs or alcohol on the day in question and repeated his claim that he never heard any sort of fight or altercation that morning before he was physically woken up by the police.

Mr. Brian Townsel testified that he accompanied the defendant to a club the night before the incident and that they arrived around midnight. He testified that there was loud music playing at the club and that while the bar area was illuminated, the club itself was dark. He testified that he saw the victim that night in the company of another young lady. He testified that the defendant "drifted off" to have a conversation with her. He testified that he could not hear this conversation—even though he was standing only a foot away—because the music was too loud. He testified that the defendant was not being aggressive that evening

and that the defendant was not an aggressive person in general.

Mr. Townsel testified that at some point the conversation escalated, and he saw the victim throw up her hands and heard her say "let's fight." He testified that the victim was so loud that "people around them turned and looked." He testified that the defendant walked away at that point, and there were no further problems during the evening. He testified that he and the defendant left the club around 2:30 a.m., and he went home and fell asleep.

On cross-examination, Mr. Townsel testified that he had known the defendant for about six years and that they were "pretty good friends." He testified that on the night in question, the victim did not approach the defendant; rather, the defendant approached the victim. He testified that he knew Mr. Chad Johnson and that he did not recall seeing him in the club that evening. He agreed that the defendant was "up in" the victim's face.

The defendant testified that she was an air traffic controller and was employed by the Transportation Security Administration in March 2009. She testified that she had lived at an address on Gaywinds Avenue since June or July of 2008. She testified that when she initially moved into the residence, the victim also moved in with her. She testified that the victim's son lived in the residence as well. She testified that she and the victim were dating at this time and that they dated for approximately a year and a half. The defendant testified that Gaywinds Avenue is an "offstreet," and the victim would not have had to drive past the house every day to take her son school.

The defendant testified that the victim moved out of the residence the first week of February and took all of her furniture and appliances with her. She testified that the victim left behind a few boxes of items such as bath rugs and toys. She testified that once she found a new roommate, she and that roommate moved all of the victim's boxes outside to the carport. The defendant testified that the child car seat and boxes located in the house on the day of the incident did not belong to the victim but rather belonged to either her or her nephew.

The defendant testified that although they were not dating and had started seeing other people, the victim still had a key to the house, and her name was still on the lease. The defendant testified that for the first three weeks after she moved out, the victim was stopping by the house every morning unannounced. The defendant testified that the last time the victim had been to the residence was approximately three weeks prior to the incident.

The defendant testified that on March 1, 2009, she met Mr. Brian Townsel and another friend and they went to a club, arriving shortly after midnight. The defendant testified that she saw the victim at this club, standing next to another female. She testified

that she walked over to speak with the victim and inquired as to the other girl's identity. She testified that the victim pulled closer to her in response and "was like, you know, what are you going to do about it," before saying "let's fight." The defendant testified that she "kind of walked off" and had no further contact with the victim for the remainder of the evening.

The defendant testified that she never said, "if I can't have you, nobody else can" to the victim. She testified that it did not bother her that the victim was with another woman. She also testified that she never saw Mr. Chad Johnson that night and that she had seen him for the first time during the trial.

The defendant testified that when she returned home from the club, she took some boxes out of a storage shed and placed them near the dumpster. She testified that some of these items belonged to the victim but that she did not place them in the garbage because she was upset. Rather, she "just wanted to be done with the whole situation." Then she texted "Ralph" and asked him to call her as soon as possible because she wanted to get the locks changed.

The defendant testified that she had told the victim prior to March 2, 2009, that her items were in the storage unit in the carport and were no longer in the house. She testified that the victim's house key would also open the storage unit. She testified that she emphasized to the victim on numerous occasions that she should call before coming over to retrieve her things.

The defendant testified that around 8:30 a.m. on the day in question she woke up to discover the victim standing over her bed. The defendant testified that "it scared me into freaking out because I couldn't understand why she was in there, you know, and we had just kind of had those words the night before." The defendant testified that she "jumped up" out of bed and politely asked the victim to leave. The defendant testified that the victim replied "is this how you want it" and "[t]his is how you want to do stuff?" The defendant testified that she again politely asked the victim to leave, and then attempted to leave her own bedroom. She testified that the victim kept blocking her from getting out.

The defendant testified that she finally got past the victim into the kitchen and ultimately reached the door to the garage. She testified that she again informed the victim that her items were out in the carport before reaching across the victim to open the door. She testified that the victim pushed her and then "came at me and grabbed my hair." She testified that "we were kind of tussling and I was trying to push her back off me to get her hand off my head." The defendant testified that she never attacked the victim, never yelled, and never cussed.

-11-

The defendant testified that the victim eventually pushed her all the way to the stove in the kitchen. She testified that the victim pulled out a steak knife from the "dish drainer." She testified that she reached for the victim's arm and hand in an effort to keep the knife as far away from her as possible. She testified that "all I remember at that point is just tussling and we ended up in the dining room area and I remember being in that corner, up against that wall, and I remember hitting the floor." She testified that she felt afraid of and threatened by the victim.

The defendant testified that afterward, she jumped back up and realized that there was blood. She testified that she told the victim that she was bleeding and that the victim asked her to call 911. The defendant testified that she grabbed her phone and called for help, then walked the victim to the kitchen bay window, where she tried to staunch the flow of blood with a towel. The defendant testified that at no point during the struggle did she ever have "full possession of that knife."

The defendant testified that she owned a dog which she had to put away once the paramedics arrived. She testified that she had no memory of telling the paramedics that someone had tripped over her dog and fallen on a knife, but she acknowledged that she "very well may have said that" because she was afraid and did not want to be in trouble. The defendant testified that she was arrested but never gave a statement to police.

On cross-examination, the defendant testified that her struggle with the victim went on for several minutes. The prosecutor asked the defendant if she remembered the testimony from the State witnesses concerning the fact that she appeared to be uninjured and her hair did not appear out of place on the day in question, and the defendant acknowledged that she did. The defendant admitted that she had never called the police to report that the victim had been stopping by the house unannounced, nor did she ever ask the victim for her key back or for the victim's name to be taken off the lease. The defendant admitted that on the morning in question she never told 911 that the victim had come in and attacked her. She also admitted that she never told the police that she had been attacked at any point after she was arrested.

The defendant testified that she had no way of knowing how serious the victim's injuries were after she had been stabbed. The defendant testified that she did not know that the victim had been cut in the leg, and she denied ever telling first responders that the victim had been cut in that location. The defendant stressed that she only put some, not all, of the victim's belongings into the dumpster on the night before the incident.

Following this testimony, the defense rested, the parties gave closing arguments, and the trial court instructed the jury. The trial court adjoined for the holiday on November 11,

-12-

2010, and the jury returned to begin deliberations at 9:28 a.m. on November 12, 2010. At 12:55p.m. that same day, the jury returned with a verdict of guilty of the lesser-included offenses of reckless aggravated assault in violation of Tennessee Code Annotated section 39-13-102, class D felonies. On January 7, 2011, the trial court sentenced the defendant to two concurrent three-year sentences, split six months in confinement with the balance to be served on probation, for a total effective sentence of three years. The trial court denied the defendant's application for judicial diversion.

The defendant filed a timely motion for new trial on January 28, 2011, which was denied by the trial court following a hearing on May 17, 2011. The defendant filed a timely notice of appeal that same day. Our decision follows.

## ANALYSIS

The defendant claims that the evidence is insufficient to support her conviction, that the trial court abused its discretion by denying her judicial diversion, and that her separate convictions for reckless aggravated assault violate the Double Jeopardy Clause. For the reasons that follow, we conclude that the evidence is sufficient to support the defendant's convictions and that the trial court did not abuse its discretion by denying the defendant's request for judicial diversion. However, we agree that the Constitution requires her separate convictions to be merged. Consequently, the case is remanded for the limited purpose of effecting a merger and entering an appropriate judgment.

## I.

The defendant claims that the evidence is insufficient to support her convictions for aggravated assault. The standards governing appellate review of sufficiency of the evidence claims were recently summarized by our supreme court:

> Appellate courts evaluating the sufficiency of the convicting evidence must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, on appeal a defendant bears the burden of showing why the evidence is insufficient to support the conviction. *State v. Parker*, 350 S.W.3d 883, 903 (Tenn. 2011). This Court affords the State the strongest legitimate view of the evidence presented at trial and the reasonable and legitimate inferences that may be drawn from the evidence. *State v. Bland*,

958 S.W.2d 651, 659 (Tenn. 1997). "The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact." *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). This Court neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury. *Bland*, 958 S.W.2d at 659. Circumstantial and direct evidence are reviewed under the same standard of review. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt. *Id.* at 381.

*State v. Carl J. Wagner*, No. M2010-00992-SC-R11-CD, ___ S.W. 3d ___, 2012 Tenn. LEXIS 746, at **18-19 (Tenn. Oct. 12, 2012).

The defendant was convicted of two counts of reckless aggravated assault. Tennessee Code Annotated section 39-13-102 provides: "A person commits aggravated assault who . . . [r]ecklessly commits an assault as defined in § 39-13-101(a)(1)" and either "[c]auses serious bodily injury to another; or . . . [u]ses or displays a deadly weapon." T.C.A. §§ 39-13-102(a)(2) (2009). Section 39-13-101(a)(1) provides that a person commits assault if he or she "[i]ntentionally, knowingly or recklessly causes bodily injury to another." T.C.A. § 39-13-101(a)(1). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." T.C.A. § 39-11-106(a)(2). "'Serious bodily injury' means bodily injury that involves . . . [p]rotracted unconsciousness . . . [e]xtreme physical pain . . . [or p]rotracted loss or substantial impairment of a function of a bodily member, organ or mental faculty." T.C.A. § 39-11-106(a)(34).

The defendant was convicted of committing reckless aggravated assault both by causing "serious bodily injury" and by displaying a deadly weapon. There was sufficient evidence for a reasonable jury to find all of the necessary elements of each offense contained in the victim's direct testimony. The victim testified that on the day in question she never struck the defendant and that no fight ever occurred. She testified that she suddenly saw the defendant "swinging" at her and felt her make contact. She testified that she saw a knife in the defendant's hand and blood on the wall. She testified that she was bleeding and having difficulty breathing. She testified that she lost consciousness for a period of time, and she woke up from the cold as she was being loaded into an ambulance. She testified that she was taken to a hospital where it was determined that she was suffering from a collapsed lung. She testified that she was intubated and received "breathing treatments." She testified that her injury was painful—she was placed on a morphine drip at the hospital, and she was still

being given pain medication at the time of her testimony at trial. She testified that medical staples were used to close up the wounds on her chest and thigh. Viewed in the light most favorable to the prosecution, and resolving any credibility issues in favor of the State, a reasonable jury could conclude from this testimony that beyond a reasonable doubt: (1) the defendant cut the victim, thereby causing "bodily injury"; (2) the defendant acted "recklessly" in causing this "bodily injury," as the injury resulted from her act of "swinging" wildly with a knife; (3) the "bodily injury" caused by the defendant was "serious," as it substantially impaired her lung function, led to protracted unconsciousness, and involved extreme physical pain; and (4) the defendant "used or displayed a deadly weapon" (a knife) in the course of causing this "bodily injury." Thus, the victim's testimony provides sufficient evidence to support all of the essential elements of both crimes at issue.

The defendant also asserts that the State never produced sufficient evidence to defeat her claim of self-defense. Section 39-11-601(b)(1) provides that:

> [A] person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

T.C.A. § 39-11-611(b)(1). Such force may even include deadly force if certain conditions are met, such as "[t]he person has a reasonable belief that there is an imminent danger of death or serious bodily injury." T.C.A. § 39-11-611(b)(2)(A). Moreover, Tennessee law provides a special presumption that this particular condition is satisfied "when [the deadly] force is used against another person, who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence, business, dwelling or vehicle, and the person using defensive force knew or had reason to believe that an unlawful and forcible entry occurred." *See* T.C.A. § 39-11-611(c). After a defendant raises facts sufficient to support a finding of self-defense, "[t]he [S]tate has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense." *State v. Belser*, 945 S.W.2d 776, 782 (Tenn. Crim. App. 1996). Whether a defendant acted in self-defense is a question of fact for the jury. *State v. Clifton*, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994).

However, evidence sufficient to support the jury's decision to reject the defendant's claim of self-defense beyond a reasonable doubt is again contained in the victim's direct testimony. The victim testified (and the defendant agreed) that she still had a key to the residence on the day of the assault, and her name was still on the residence's lease—both with the knowledge and consent of the defendant. Consequently, the victim still had the legal

-15-

right to enter the premises. The victim also testified that she and the defendant had previously agreed that she would come over to the residence on the day in question to retrieve some of her belongings, which were still stored at the house. The victim testified that she peaceably let herself into the house using her key. If credited, these facts amply suffice to defeat any claim that the victim unlawfully and forcefully entered the residence on the day in question, thus depriving the defendant of any benefit of the special presumption afforded by section 611(c) .

Absent the special presumption, the defendant's use of deadly force would not be justified unless, *inter alia*, the defendant had a reasonable belief that there was an "imminent danger of death or serious bodily injury." However, the victim testified that she never struck or fought with the defendant. She testified that the defendant attacked her suddenly and without warning while her back was turned. The jury was free to credit this testimony and reject the defendant's claim of self-defense.

The defendant argues that the jury's verdict—finding her not guilty of intentional aggravated assault, but instead only guilty of the lesser included offense of reckless aggravated assault—indicates that the jury "rejected [the victim's] version of events, and instead seems to have embraced [the defendant's] recitation of the facts." Such a claim, even if true, is not relevant to the resolution of a sufficiency of the evidence challenge. As discussed, under the appropriate standard of review, an appellate court must resolve all conflicts in the evidence—in this case, the direct conflict between the victim's testimony and the defendant's testimony concerning the victim's behavior prior to the stabbing—in favor of the State. *See, e.g., Campbell*, 245 S.W.3d at 335. The victim testified that she never struck the defendant on the day in question and that her back was to the defendant when the assault occurred. A reasonable jury was free to conclude beyond a reasonable doubt from this testimony that the necessary elements of self-defense were not satisfied.

The record supports the jury's conclusion that all of the essential elements of both types of reckless aggravated assault were satisfied and that the defendant did not act in self-defense. The defendant's claim that the evidence is insufficient to support her convictions is denied.

## II.

The defendant also claims that her dual convictions for reckless aggravated assault violate the federal and state prohibitions against double jeopardy. *See* U.S. CONST. Amend. V ("No person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb."); TENNESSEE CONST. Art. I, §10 ("[N]o person shall, for the same offence, be twice put in jeopardy of life or limb."). We review this type of double jeopardy claim de

novo. *See State v. Thompson*, 285 S.W.3d 840, 846 (Tenn. 2009).

In this case, it is evident that both of the defendant's convictions arise from a single transaction—the defendant's assault on the victim on the morning of March 2, 2009. The defendant was convicted for this assault twice under the same general provision, section 39-13-102(a)(1)(B), using two different theories of criminal liability. Convicting an individual twice under the same statute for the same act so fundamentally violates federal and state double jeopardy principles that extended analysis of the defendant's claim is not required. The State concedes error and acquiesces in remand. The State notes in its brief that it appears that the trial court intended to merge the convictions but simply failed to reduce them to a single judgment form. Our review of the record leads us to agree that the defendant's convictions were not merged due to a simple oversight. Consequently, we remand the case to the trial court for purposes of entering a corrected judgment.

## III.

Finally, the defendant claims that the trial court abused its discretion by denying her request for judicial diversion. Judicial diversion is a legislative largess that affords certain types of convicted defendants the opportunity to avoid having a permanent criminal record provided certain conditions are met. *See* T.C.A. § 40-35-313(a). We review a trial court's decision to deny judicial diversion under an abuse of discretion standard. *State v. Electroplating, Inc.*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998). "[T]his Court will not interfere with the refusal of the trial court to grant judicial diversion if there is any substantial evidence to support the refusal contained in the record." *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996) (internal quotation omitted). There is no presumption in favor of judicial diversion under section 40-35-313. *See Electroplating*, 990 S.W.2d at 228.

"In determining whether to grant judicial diversion, the trial court must consider[:] (a) the accused's amenability to correction, (b) the circumstances of the offense, (c) the accused's criminal record, (d) the accused's social history, (e) the accused's physical and mental health, (f) the deterrence value to the accused as well as others, and (g) whether judicial diversion will serve the interests of the public as well as the accused." *Id.* at 229. "[T]he record must reflect that the court has weighed all of the factors in reaching its determination," and "if the court has based its determination on only some of the factors, it must explain why these factors outweigh the others." *Id.* If a trial court fails in this duty, we may review the record to determine whether the trial court reached the correct result notwithstanding its failure to explain its reasoning. *See id.*

Our review of the record leads us to conclude that the trial court considered all of the relevant factors. In the defendant's favor, the trial court found that she had a "lack of

criminal record, [and a] good employment history. . . ." Nor did the trial court hold the circumstances of the offense against the defendant, stating that while an "argument could be made" that the defendant's offense was "extremely aggravated or exaggerated," the court was not going to apply this factor. And while the trial court stated that it was "common sense . . . that this domestic violence is something that needs to be deterred," the trial court also refused to deny the defendant diversion based on deterrence or the need to protect the public, explaining that it did not feel that the "evidence in the record with regard to the matter" was sufficient.

However, when the trial court considered the defendant's amenability to correction and whether diversion would serve the interests of the accused, the trial court found that these factors weighed strongly against diversion and that they outweighed all of the other factors. With respect to whether diversion would serve the interests of the accused, the trial court agreed with the prosecution that the defendant "hasn't really accepted responsibility for what's going on." With respect to her amenability to correction, the trial court concluded that the defendant had demonstrated a severe lack of potential for rehabilitation because she had shown a remarkable degree of untruthfulness during her testimony at the trial. The trial court, having witnessed (and specifically referencing) the defendant's demeanor on the stand, determined not only that her sworn testimony was not credible, but that she had affirmatively "committed perjury during the course of the trial." In this regard, the trial court referenced several specific instances in which the court found that the defendant had lied under oath, including her claim that the victim had "stabbed herself in the course of a tussel" and "when [she] testified that she merely was putting the possessions of the victim on the curb," yet "we all saw a picture of them in the garbage can." The trial court found that the defendant's "lies . . . continued throughout the course of the trial." As the trial court explained, "you can't come up here and roll the dice and commit perjury and then come back here and say give me judicial diversion." The trial court concluded that the defendant's extensive perjury—combined with her failure to take any meaningful responsibility for her crime—fully demonstrated that she was not amenable to correction, that placing her on diversion was not in her interests, and that these facts were such a "big[] problem" that they outweighed all other considerations. The trial court's reasons for reaching this conclusion are well documented in the record. The law requires no more.

After reviewing the record, we can discern no error in the trial court's analysis. The trial court amply explained on the record why diversion was not in the best interests of the accused and why consideration of this factor—in addition to the accused's demonstrable lack of amenability to correction—sufficed to outweigh all of the other factors. The defendant's claim that the trial court abused its discretion by denying her application for judicial diversion is denied.

## CONCLUSION

For the foregoing reasons, the case is remanded to the trial court.


_____

JOHN EVERETT WILLIAMS, JUDGE